IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | ) | CV. NO. 5:12-CV-1127-DAE |
| | ) | Bankr. No. 12-50073-a998 |
| DELTA PRODUCE, LP, et al., | ) | |
| | ) | |
| Debtors, | ) | |
| _____ | ) | |
| | ) | |
| KINGDOM FRESH PRODUCE, et al., | ) | |
| | ) | |
| Appellants, | ) | |
| vs. | ) | |
| | ) | |
| BEXAR COUNTY, et al., | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

<u>ORDER DENYING MOTION FOR RECONSIDERATION</u>

On June 17, 2014, the Court heard oral argument on a Motion for

Reconsideration of this Court's Order Affirming In Part and Vacating In Part the

Bankruptcy Court's Order Granting Special Counsel's First Fee Application filed

by Special PACA Counsel Craig A. Stokes ("Special Counsel"). (Dkt. # 24.)

Craig A. Stokes, Esq., represented himself as Special Counsel; Scott E. Hillison,

Esq., represented Appellants Kingdom Fresh Produce, Inc., I. Kunik Company,

Inc., Five Brothers Jalisco Produce Co. Inc. d/b/a Bonanza 2001, Rio Bravo

1

Produce Limited, LLC, and G.R. Produce, Inc. (collectively, "Kingdom Fresh").

Thomas McKenzie, Esq., appeared on behalf of the Trustee for Debtor Delta

Produce.   After careful consideration of the memoranda supporting and opposing

the motion, as well as the arguments presented at the hearing, the Court **DENIES**

Special Counsel's Motion for Reconsideration.

BACKGROUND

This matter arises from the appointment of a Special Counsel to

adjudicate claims made pursuant to the Perishable Agricultural Commodities Act

of 1930 ("PACA"), 7 U.S.C. § 499(a)–(t).  Before discussing this case's procedural

history, the Court will set out the legal landscape for PACA claims generally.

I.     The Perishable Agricultural Commodities Act ("PACA")

Congress designed PACA to regulate the produce industry and

promote fair dealings in transactions involving fruits and vegetables.  Golman-

Hayden Co. v. Fresh Source Produce Inc., 217 F.3d 348, 350 (5th Cir. 2000).  As

stated in the House Report to the 1984 amendments to the Act, PACA was enacted

> to encourage fair trading practices in the marketing of perishable
> commodities by suppressing unfair and fraudulent business practices
> in marking of fresh and frozen fruits and vegetables . . . and providing
> for collecting damages from any buyer or seller who fails to live up to
> his contractual obligations.

H.R. Rep. No. 543, 98th Cong., 2d Sess. 3 (1983); see also Pac. Intern. Mktg., Inc.

v. A & B Produce, Inc., 462 F.3d 279, 282 (3d Cir. 2006) ("Congress intended

2

PACA to protect small farmers and growers who were vulnerable to the practices of financially irresponsible buyers.").  To this end, PACA requires buyers of produce to make "full payment promptly," <u>Bocchi Americas Assocs. Inc. v. Commerce Fresh Mktg. Inc.</u>, 515 F.3d 383, 387–88 (5th Cir. 2008) (quoting 7 U.S.C. § 499b(4)), and if a buyer fails to tender prompt payment, the seller may file a complaint with the United States Department of Agriculture or file a civil suit against the buyer, <u>id.</u> (citing 7 U.S.C. § 499e(a)–(b)).

   Congress added two powerful tools to address buyers' proclivity to default before tendering full payment to sellers.  First, PACA establishes a scheme in which a buyer of produce on credit is required to hold the produce and its derivatives and/or proceeds in trust for the unpaid seller.  7 U.S.C. § 499e(c)(2); <u>Endico Potatoes v. CIT Group/Factoring</u>, 67 F.3d 1063, 1067 (2d Cir. 1995) (holding that PACA incorporates ordinary principles of trust law so that a buyer holds legal title to the produce and its derivatives, but the seller retains an equitable interest in the trust property pending payment); <u>see also</u> <u>Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.</u>, 336 F.3d 410, 413 (5th Cir. 2003) (holding that § 499e(c)(2) creates, "immediately upon delivery, a nonsegregated 'floating' trust in favor of sellers on the perishable commodities sold and the products and proceeds derived from the commodities").  "Congress provided this remedy because 'prior to this amendment, unpaid produce suppliers were

3

unsecured creditors vulnerable to the buyers' practice of granting other creditors a

security interest in their inventory and accounts receivable." Pac. Intern. Mktg.,

462 F.3d at 282 (quoting Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197,

199 (3d Cir. 1998)).

Second, "if the seller is not paid promptly, the buyer must preserve

trust assets, and the seller has a 'superpriority' right that trumps the rights of the

buyer's other secured and unsecured creditors." Bocchi Americas Assocs. Inc.,

515 F.3d at 388; accord 7 U.S.C. § 499e(c)(1); see also Gargiulo v. G.M. Sales,

Inc., 131 F.3d 995, 999 (11th Cir. 1997) ("The PACA grants the sellers of such

commodities the right to recover against the purchasers and puts the sellers in a

position superior to all other creditors.").

Sellers are only entitled to the trust assets and "superpriority" status if

they comply with certain procedural requirements. An unpaid seller must

demonstrate that:

    (1) the commodities sold were perishable agricultural commodities;
    (2) the purchaser of the perishable agricultural commodities was a
        commission merchant, dealer or broker;
    (3) the transaction occurred in interstate or foreign commerce;
    (4) the seller has not received full payment on the transaction; and
    (5) the seller preserved its trust rights by giving written notice to the
        purchaser within the time provided by law.

7 U.S.C. § 499e.  If a seller satisfies § 499e's requirements, however, a trust

automatically arises in favor of the seller until full payment has been received.  Id.

4

§ 499e(c)(2); <u>see also</u> <u>In Re Milton Poulos, Inc.</u>, 947 F.2d 1351, 1352 (9th Cir. 1991).

> Because trust principles apply and the debtor only holds legal—not equitable—title, if the debtor files for bankruptcy, the PACA trust assets are excluded from the bankruptcy estate.  <u>See, e.g.</u>, 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); <u>Ruby Robinson Co., Inc. v. Herr</u>, 453 F. App'x 463, 465 (5th Cir. 2011) ("Ordinary principles of trust law apply to trusts created under PACA, so that for instance the trust assets are excluded from the estate should the dealer go bankrupt." (quoting <u>Sunkist Growers, Inc. v. Fisher</u>, 104 F.3d 280, 282 (9th Cir. 1997))).

II.    <u>Procedural Background</u>

> This matter incorporates three PACA lawsuits that were filed in the United States District Court for the Western District of Texas against Delta Produce LP ("Delta Produce"), a local produce company.

> On January 3, 2012, Delta Produce filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for

the Western District of Texas.  (Bankr. Dkt. # 1.)[1]  Delta then moved to impose an

automatic stay of the three lawsuits pending in district court under 11 U.S.C.

§ 362.  (Case No. 1:11-cv-01114-SS, Dkt. ## 24, 26.)  Two days later, Delta

Produce asked the district court to abate its proceedings and allow various

creditors, including PACA creditors, to assert their claims before the Bankruptcy

Court in San Antonio.  (Id.)  Upon receipt of Delta Produce's motion and several

PACA claimants' consent, the district court referred the case to the bankruptcy

court in San Antonio, noting that "the parties apparently agree that the Bankruptcy

Court would be the appropriate and preferable place to adjudicate the claims

presented in this case."  (Case No. 5:12-cv-00046-XR, Dkt. # 28.)

        After the PACA claims were referred to the bankruptcy court, Delta

Produce filed a proposed PACA Claim Procedure in bankruptcy court, which

included the appointment of Special Counsel Craig A. Stokes ("Special Counsel")

to adjudicate PACA claims.  (Bankr. Dkt. # 31.)  Several PACA claimants—but

not Appellants here—agreed to the motion.[2]  On January 24, 2012, the bankruptcy

court held a hearing to consider a Motion for Orders Establishing a Deadline to

---

[1] Except as otherwise noted, all citations are to the bankruptcy docket in Case No. SA:12-BK-50073-LMC.

[2] The PACA Claimants that did agree to the motion include: Wilson Davis Co.; Averrit Brokerage Co., Inc.; A&A concepts, LLC; Greenhouse Produce Company, LLC; Juniper Tomato Grower, Inc.; Mecca Family Farms, Ltd.; London Fruit, Inc.; Triple H Produce, LLC; and The Pumpkin Patch, LLP.  (Bankr. Dkt. # 31 at 9.)

File PACA Trust Claims and for Procedures to Resolve those Claims and for the Appointment of Special Counsel.  (<u>See</u> Special Counsel Appointment Hr'g, Jan. 24, 2012, Dkt. # 31.)  Kingdom Fresh was present at that hearing, but did not address the bankruptcy court.

The following day, the bankruptcy court issued an order establishing a deadline to file PACA trust claims, for procedures to resolve those claims, and for the appointment of Special PACA Counsel (the "PACA Order").  (Bankr. Dkt. # 52.)  The PACA Order specifically directed Special Counsel to inform all of Delta Produce's creditors that had not already joined the litigation of the PACA claims procedure.  (<u>Id.</u> at 2 ("On or before February 11, 2012, the Court-appointed Special PACA Counsel for the Debtor, Craig A. Stokes ('Special PACA Counsel'), shall mail a copy of this Order by certified mail, return receipt requested, to all entities listed on DELTA's Accounts payable schedule.").)  Special Counsel was also tasked with preserving and collecting PACA trust assets, negotiating and compromising debts owed by an account holder of Delta Produce, considering and reviewing claims asserted under the PACA trust, and providing status reports to PACA creditors.  (<u>Id.</u> at 8–10.)  With regard to attorney's fees, Paragraph 15(b) of the order specified:

> <u>Special PACA Counsel shall be "entitled" to paid attorney's fees and costs from the PACA trust funds for the services rendered pursuant to this Order</u>.  The Court will determine the reasonable "amount" of such

attorney's fees and costs.  To be paid, Special PACA Counsel shall
file a motion(s) for attorney's fees and costs, [and] should attach time
sheets that have reasonably detailed time entries and which reflect
time in increments of ".1" of an hour.  Stokes may file interim
motions for attorney's fees and costs.

(Id. at 10–11 (emphasis added).)  No party objected to the PACA Order.

After the PACA Order established the timeline for adjudicating

PACA claims, Delta Produce informed potential PACA creditors of the pending

PACA claim procedure.  From January to March 2012, PACA Creditors filed

claims against Delta Produce totaling $1,676,015.25.  Special Counsel negotiated

PACA claims with Delta Produce and its PACA creditors.

On August 14, 2012, Special Counsel filed its First Interim

Application for attorney fees.  (Bankr. Dkt. # 284.)  He sought $95,978.00 in

attorney fees and $2,492.97 in expenses for work completed between January 3,

2012, and August 7, 2012, to be paid from the PACA trust.  (Id.)

PACA Claimant Kingdom Fresh objected to Special Counsel's First

Interim Application on the ground that the PACA trust funds should not be used to

pay Special Counsel's fees.  (Bankr. Dkt. # 294.)  Kingdom Fresh argued that

(1) the Bankruptcy Court lacked subject-matter jurisdiction to use non-estate assets

beyond the reach of bankruptcy powers to satisfy the administrative expense

claims against the bankruptcy estate, (2) the PACA trust assets that Delta Produce

held could not be used to pay Special Counsel's fees (nor Delta Produce's

8

attorney's fees), and (3) Delta Produce's Counsel already had a pre-existing duty to collect the Debtors' accounts receivable and thus Special Counsel could not be paid with PACA trust funds.  (Id.)

On September 21, 2012, the bankruptcy court held a hearing to consider Special Counsel's First Interim Application for attorney fees.  (See "First Interim Fee Hr'g, Sept. 21, 2012," Bankr. Dkt. # 381.)  Over Kingdom Fresh's objections, the bankruptcy court granted Special Counsel's First Interim Application for attorney fees.  (Bankr. Dkt. # 320.)  Kingdom Fresh timely filed an appeal, arguing that the bankruptcy court lacked jurisdiction to award Special Counsel's fees and PACA proscribed paying such fees from PACA trust funds. (Bankr. Dkt. # 340; Dkt. # 1.)

On September 27, 2013, this Court affirmed in part and vacated in part the bankruptcy court's award of fees to Special Counsel.  ("Order," Dkt. # 23.) The court held that the bankruptcy court did have jurisdiction and adjudicative authority to award Special Counsel his attorney's fees.  (Id. at 9–19.)  However, the bankruptcy court erred in granting his fees because PACA does not authorize paying such fees until all PACA trust beneficiaries, as holders of a "superpriority" status, have been paid, and in this case, it was undisputed that paying Special Counsel's fees would result in PACA beneficiaries not receiving full payment of their PACA claims.  (Id. at 21–26.)

9

On October 11, 2013, Special Counsel filed the instant Motion for Reconsideration and requested an oral hearing.[3]  ("Mot.," Dkt. # 24.)  Kingdom Fresh filed a Response.  ("Resp.," Dkt. # 26.)  On November 14, 2013, Special Counsel filed his Reply.  ("Reply," Dkt. # 30.)

On May 28, 2014, Amicus Curiae Randolph N. Osherow ("Amicus") submitted an Amicus Brief in support of Special PACA Counsel's Motion for Reconsideration.  ("Amicus Br.," Dkt. # 35.)  On June 11, 2014, Kingdom Fresh filed its Response to Amicus Curiae's brief.  ("Resp. Amicus Br.," Dkt. # 37.)

<u>LEGAL STANDARD</u>

While the Federal Rules of Civil Procedure do not expressly provide for a "motion for reconsideration," such a motion is usually construed as either a Rule 59(e) motion to alter or amend the judgment or a Rule 60(b) motion for relief from a final judgment or order.  <u>Shepherd v. Int'l Paper Co.</u>, 372 F.3d 326, 328 n.1 (5th Cir. 2004).  Because Special Counsel's Motion was filed more than twenty-eight days after the entry of the judgment, it is untimely under Rule 59(e). <u>See</u> Fed. R. Civ. P. 59(e) (requiring such a motion to be filed "no later than 28 days

---

[3] Although Special Counsel filed a Motion for Reconsideration of the Court's Order, he averred that the issues discussed in his Motion are largely moot because 89% of the PACA claimants have "expressly waived rights to challenge Special Counsel's fees and waived any claim for disgorgement for fees to Special Counsel."  (Mot. at 9.)  However, because 100% of all PACA claimants have not agreed, there remains a monetary dispute and the matter is not moot.

after the entry of the judgment").  Accordingly, the Court construes Special

Counsel's Motion as a Rule 60(b) motion for relief from a final judgment or order.

See Fed. R. Civ. P. 60(c) (requiring Rule 60(b) motions to be filed "within a

reasonable period of time" and, when the motion is based on certain grounds, "no

more than a year after the entry of judgment").

Rule 60(b) sets out six grounds for granting relief from a final

judgment:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly
> discovered evidence which by due diligence could not have been
> discovered in time to move for a new trial under rule 59(b); (3) fraud
> (whether heretofore denominated intrinsic or extrinsic),
> misrepresentation, or other misconduct of an adverse party; (4) the
> judgment is void; (5) the judgment has been satisfied, released, or
> discharged, or a prior judgment upon which it is based has been
> reversed or otherwise vacated, or it is no longer equitable that the
> judgment should have prospective application; or (6) any other reason
> justifying relief from operation of the judgment.

Fed. R. Civ. P. 60(b).  Relief under Rule 60(b)(6) is granted only when

"extraordinary circumstances" not covered by the five enumerated grounds are

present.  Batts v. Tow-Motor Forklift Co., 66 F.3d 743, 747 (5th Cir. 1995)

(citations omitted).  "The district court enjoys considerable discretion when

determining whether the movant has satisfied any of these Rule 60(b) standards."

Teal v. Eagle Fleet, Inc., 933 F.2d 341, 347 (5th Cir. 1991).

<u>DISCUSSION</u>

11

Special Counsel makes two arguments in support of his Motion for Reconsideration: (1) the Court's reliance on C.H. Robinson v. Alanco, 239 F.3d 483 (2d Cir. 2001) was misplaced, and (2) Kingdom Fresh's silence at a hearing indicates that it consented to the PACA Order providing for Special Counsel's fees, thereby equitably estopping Kingdom Fresh from subsequently challenging such fees.  (Mot. at 2.)

I.    C.H. Robinson

The Court's Order denying Special Counsel his attorney's fees predominantly relied on C.H. Robinson.  (Order at 22.)  In support of his Motion for Reconsideration, Special Counsel now argues that the facts of that case make it inapplicable to the present scenario.  (Mot. at 2.)

In C.H. Robinson, Robinson, a produce seller, filed a PACA claim to recover more than $200,000 in unpaid produce purchases from the bankrupt Alanco Corp., a produce buyer.  239 F.3d at 485.  When Robinson settled its PACA trust claim with Alanco, Mark Mandell, acting as trustee for the PACA trust, turned over the remaining proceeds Alanco had left to Robinson, but withheld $18,960.57.  Id.  Mandell then applied to the district court to enforce an attorney's lien on the $18,960.57.  Id.  The district court denied Mandell's motion. Id.

On appeal to the Second Circuit, Mandell argued that he was entitled

to the $18,960.57 sum as payment for fees he earned performing necessary

services to collect Alanco's accounts receivable, which had been held in trust for

the benefit of Robinson under PACA.  Id. at 486.  He also contended that his

services were in fulfillment of Alanco's duty to the PACA trust beneficiaries and

solely for their benefit and that therefore he was entitled to be paid out of the trust

res under general principles of trust law.  Id.

   The Second Circuit disagreed.  The court acknowledged that "black-

letter trust law" provides that a "trustee can properly incur expenses which are

necessary and appropriate to carry out the purposes of the trust and are not

forbidden by the terms of the trust."  Id. (quoting Restatement of Trusts (Second)

§ 188 (1957)).  But the court considered PACA meaningfully different, finding that

"[t]rusts created under PACA are statutory trusts, and common law trust principles

are not applicable if they conflict with the language of the statute, the clear intent

of Congress in enacting the statute, or the accompanying regulations."  Id. at 487.

In fact, the only reason Congress labeled PACA claims as "trusts," the court

reminded, was to strengthen a produce seller's contractual rights in a defunct

buyer's bankruptcy proceeding.  Id. (citing H.R. Rep. No. 543, 98th Cong. 2d Sess.

3 (1983) (explaining that given the proclivity for buyers to enter bankruptcy,

PACA was intended to "increase the legal protection for unpaid sellers and

suppliers of perishable agricultural commodities" in bankruptcy proceedings)).

13

The court also relied on PACA's accompanying regulations, which directed that PACA trustees have a duty under PACA to pay the full amount of the debt owed to PACA claimants before paying any other creditors (i.e., attorneys). Id. at 487–88.  The court first referenced 7 C.F.R. § 46.46(a)(2), which defined "dissipation" of trust assets as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid [sellers] to recover money owed in connection with produce transactions."  The court then cited 7 C.F.R. § 46.46(d), which stated that "[c]ommission merchants, dealers, and brokers are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations of perishable agricultural commodities."  Id. at 488.

The court concluded that because Mandell's withholding of the $18,690.57 in attorney's fees left Alanco unable to satisfy the remainder of Robinson's PACA claim, he impaired Robinson's ability to recover the money it had been owed under PACA.  Id.  In other words, the court explained, "[a]llowing a defunct PACA trustee to pay other creditors [i.e., their attorneys] with PACA funds before the seller [PACA claimant] is paid in full would frustrate [Congress's] purpose, and would be contrary to the language of PACA and its accompanying regulations."  Id.  Mandell, as the PACA trustee, was not able to use PACA funds to pay himself attorney fees incurred in collecting accounts receivable

14

held in trust for Robinson.  Id. at 488–89.

   This Court's Order analogized Special Counsel's role in the instant litigation to that of Mandell in C.H. Robinson.  (Order at 25.)  Recognizing that "a trustee's duties are to covert to cash all debts and securities that are not qualified legal investments[,] to protect and preserve trust property, and to ensure that it is employed solely for the beneficiary," (id. at 26 (quoting Black's Law Dictionary 9th ed. 2009)), the Court found that Special Counsel functioned as a trustee for the PACA trust because the bankruptcy court tasked Special Counsel with "tak[ing] those steps reasonably necessary to preserve and collect the PACA trust assets" and "facilitat[ing] the distribution of the collected PACA trust assets," (id. at 25 (quoting Bankr. Dkt. # 52 at 8–9)).

   Accordingly, the Court found that

> Under the reasoning in C.H. Robinson, Special Counsel, acting as a trustee of the PACA trust, is not entitled to attorney fees paid out of the PACA trust.  Special Counsel "has a fiduciary obligation under PACA to repay the full amount of the debt owed to the PACA beneficiary."  See C.H. Robinson, 239 F.3d at 488.  Here, PACA trust beneficiaries had not received full payment when the bankruptcy court granted Special Counsel's First Interim Application for attorney fees. Only when PACA trust beneficiaries receive full payment may a PACA trustee use the remaining PACA trust funds to pay the trustee's attorney fees.  Any action before PACA trust beneficiaries receive full payment would directly violate the language of PACA and its regulations.

(Id. at 26 (footnote omitted).)

15

Special Counsel now argues that this Court's reliance on <u>C.H.</u> <u>Robinson</u> was misplaced because the facts in that case are distinguishable.  (Mot. at 2.)  He advances two arguments: (1) unlike Mandell, he was appointed by the bankruptcy court, and (2) unlike Mandell, he was not a PACA trustee. Additionally, Amicus, a Chapter 7 Trustee, argues that applying <u>C.H. Robinson</u> was in error because it has produced dire consequences for adjudicating PACA claims in bankruptcy court.

A.     <u>Appointment by the Bankruptcy Court</u>

Special Counsel contends that because he was appointed by the bankruptcy court, his fee application is meaningfully different from Mandell in <u>C.H. Robinson</u>.  Special Counsel cites the <u>trial court order</u> in <u>C.H. Robinson</u>, as that court noted the possibility of compensating Mandell if Robinson had agreed:

> Mandell's claim that Robinson's counsel did not seek to take over the representation of Alanco and did not object to Mandell's statement that he would take his fee from the PACA trust assets, are insufficient to overcome the policies behind the PACA trust.  Mandell is now asking that Robinson's money be spent on his fee; but if Robinson wanted to retain him to collect Alanco's PACA funds for Robinson's benefit, it would have done so.  Robinson's counsel silence did not amount to a promise to allow Mandell to recover his fees from the Robinson's PACA trust.  <u>Moreover, if Mandell really had been concerned at whether he would be paid from Alanco's PACA trust funds, he could have moved early in these cases, rather than at their conclusion for a ruling on the attorney fee lien issue.</u>

(<u>Id.</u> at 3 (emphasis in Motion) (citing <u>C.H. Robinson Co. v. Alanco Corp.</u>, 97 CIV.

16

6018 (AJP), 2000 WL 101238, at *4 (S.D.N.Y. Jan. 28, 2000), aff'd, 239 F.3d 483 (2d Cir. 2001)).)  Special Counsel asserts that he (as well as Debtor's counsel and PACA trust creditors) did "exactly what the district court in C.H. Robinson said must be done to avoid loss of counsel fees," namely filing a motion for appointment of Special PACA Trust Counsel, giving notice to "all creditors," and obtaining a court order approving the appointment and payment of such counsel from PACA trust funds.  (Id.)  He maintains that "[n]owhere in the Second Circuit's opinion in C.H. Robinson does that court foreclose a debtor and petitioning creditors from expressly seeking court permission to hire counsel to collect PACA receivables, a distinguishing factor recognized by the trial court in that same case."  (Id. at 3–4.)

There are several problems with Special Counsel's argument.  First, and most obviously, the trial court in C.H. Robinson did not hold that if Mandell would have moved early on in the case, he would have been entitled to attorney's fees.  Quite the contrary, the passage Special Counsel cites makes clear that the trial court only suggested that Mandell could have moved earlier to assuage his concerns over his fees.  See C.H. Robinson Co., 2000 WL 101238, at *4 ("Moreover, if Mandell really had been concerned at whether he would be paid from Alanco's PACA trust funds, he could have moved early in these cases, rather than at their conclusion for a ruling on the attorney fee lien issue." (emphases

17

added)).  Special Counsel is essentially extrapolating one sentence from the trial court's opinion to mean that moving for attorney's fees early in the case ensures payment; such a reading, however, is overly generous.

Second, although the Second Circuit affirmed the trial court's denial of fees to Mandell, the Second Circuit did not credit the passage cited by Special Counsel, nor did the circuit court even hint at the possibility of an early motion to secure attorney's fees.  Instead, the court explained why the statute's text, purpose, and accompanying regulations prohibited using PACA trust funds to pay attorney's fees incurred in the collective accounts receivable held in trust for the beneficiary sellers.  See C.H. Robinson, 239 F.3d at 488 ("Allowing a defunct PACA trustee to pay other creditors with PACA funds before the seller is paid in full would frustrate [Congress's] purpose.").

In an effort to nullify this Court's reliance on C.H. Robinson, Special Counsel alternatively asserts that "the Second Circuit has [later] held that its decision in C.H. Robinson v. Alanco Corp. does not apply to payments from PACA trust assets that are authorized by the court."  (Reply at 1 (citing "R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp., 467 F.3d 238 (2d Cir. 2006)).)  He posits that "R" Best "noted that counsel who was court-appointed, and acting for the benefit of PACA trust creditors, unlike a trustee, can be paid by PACA trust assets."  (Id. at 2 (citing "R" Best, 467 F.3d at 243).)  There are serious flaws in

18

Special Counsel's arguments with respect to <u>"R" Best</u>.  Chief among the flaws is

the contention that <u>"R" Best</u> held that a court-appointed "special counsel" or

"special master" can be paid by PACA trust assets.  Once again, Special Counsel's

argument wholly misconstrues a court's opinion.

In <u>"R" Best</u>, a railroad company transported perishable agricultural

goods from various suppliers to P.J. Produce.  467 F.3d at 240.  P.J. Produce

eventually defaulted on payments to suppliers and the railroad.  <u>Id.</u>  As a result, the

railroad sued P.J. Produce to attempt to enforce the trust provisions of PACA.  <u>Id.</u>

The Second Circuit first found that the railroad did not qualify as a PACA trust

beneficiary because it was not a "seller of perishable agricultural commodities,"

only a transporter.  <u>Id.</u> at 241–42.  The court next considered the railroad's

common-law trust argument that administrative expenses should be paid from

PACA trust funds:

> Union Pacific primarily relies on two lower court decisions that
> allowed certain administrative expenses to be paid from PACA trust
> funds.  <u>See</u> <u>Six L's Packing Co., Inc. v. Post & Taback, Inc.</u>, 132 F.
> Supp. 2d 306, 309 (S.D.N.Y. 2001) (allowing a court-appointed
> Special Master's fees and expenses to be paid out of PACA trust
> funds).

<u>Id.</u> at 242–43.  The court held that the railroad could not rely on <u>Six L's Packing</u>

because it was not performing quasi-judicial duties.  <u>Id.</u> at 243.  The court noted

that "[t]he trust funds could be used to pay the Special Master's fees [in <u>Six L's</u>

Packing], in contrast, because the Special Master would be 'acting on the Court's behalf in performing quasi-judicial duties and for the joint benefit of all . . . PACA creditors." Id. The court found that "Union Pacific's position does not resemble that of a Special Master or a trustee in bankruptcy. It provided its services directly to P.J. Produce, and did not act at the court's direction or for the exclusive benefit of the PACA beneficiaries." Id. (internal citations omitted)).

While the "R" Best court did hint at the approval of Six L's Packing's decision to allow a Special Master to be paid with PACA trust funds, the court's distinguishing treatment of Six L's Packing is a far cry from the wholesale adoption that Special Counsel advances.[4]  Instead, the court went to great lengths to emphasize "Congress's intent to protect sellers as the exclusive beneficiaries of the PACA trust." Id.; see also id. at 242 ("[T]he legislative history and the text of the statute as well as the implementing regulations all make clear that trust assets are intended exclusively to benefit produce suppliers.").

And even if "R" Best did rely on Six L's Packing, such reliance would be highly suspect because Six L's Packing did not give any reasoned opinion as to how or why the court allowed a special master to be paid from PACA trust funds. There, the Southern District of New York appointed James Niss, Esq., as a "Special Master" to assist the court in evaluating the PACA claims.  132 F. Supp.

---

[4] Even West Publishing notes that "R" Best distinguished Six L's Packing.

2d at 309.  The court only stated that "[b]ecause the Special Master will be acting

on the Court's behalf in performing quasi-judicial duties and for the joint benefit of

all Post & Taback PACA creditors, his reasonable fees and expenses shall be paid

from Post & Taback's PACA trust funds."  Id.  The court did not provide any legal

authority for authorizing such compensation from PACA trust funds.[5]

      Accordingly, neither the trial court order in C.H. Robinson, nor the

Second Circuit's opinion in "R" Best warrants a different decision.

    B.    Trustee Status

      Special Counsel next argues that this Court's reliance on the Second

Circuit's opinion in C.H. Robinson is misplaced because he was not a "trustee"

like Mandell.  (Mot. at 4.)  Special Counsel is correct that Mandell functioned as

the attorney of the defunct buyer, Alanco, and therefore was characterized as a

"trustee."  See C.H. Robinson, 239 F.3d at 486 (describing Alanco, and therefore

Mandell as Alanco's attorney, as the PACA trustee because 7 U.S.C. § 499e(c)(2)

requires a buyer to hold produce and its derivatives in trust for the unpaid sellers).[6]

Special Counsel is also correct that he was not technically the PACA Trustee

because 7 U.S.C. § 499e(c)(2) provides that the defunct buyer, Delta Produce, is

---

[5] The Six L's Packing court only cited to Federal Rule of Civil Procedure 53(a),
which authorizes a court to appoint a special master.  The court did not discuss any
authority for compensating the special master with PACA trust funds.

the trustee, and therefore Delta Produce's lawyer functions as the "trustee" by holding legal title to the goods for the benefit of the sellers, like Kingdom Fresh and other PACA Claimants.

Although Special Counsel was not a "trustee" per se, the Court finds that its reliance on <u>C.H. Robinson</u> was appropriate given that Special Counsel was tasked with many of the same duties that a trustee would perform, including: "tak[ing] those steps reasonably necessary to preserve and collect the PACA trust assets" and "facilitat[ing] the distribution of the collected PACA trust assets" by "(a) attempting to determine the extent to which assets are PACA trust assets, including filing or defending adversary proceedings including declaratory judgment actions, (b) examining PACA trust claims filed by alleged PACA trust beneficiaries, and objecting to those claims where appropriate, (c) collecting the Debtors' accounts receivables, including filing adversary actions, and (d) liquidating PACA trust assets other than the accounts receivables into cash." (Bankr. Dkt. # 52 at 8–9.)

In fact, Kingdom Fresh argues that Special Counsel was—for all intents and purposes—working on behalf of Trustee Delta Produce.  (Resp. at 4.)

---

[6] To be clear, once a buyer receives goods from a seller, the buyer holds the goods (or their derivatives) "in trust" for the benefit of the seller until the buyer tenders payment to the seller.  Therefore, the buyer is the trustee of the goods and their derivatives for the benefit of the seller.

Kingdom Fresh points out that Special Counsel was employed by Delta Produce as their § 327(e)[7] special litigation counsel.  (Id. (citing Bankr. Dkt. # 118).)  The motion to appoint Special Counsel as a § 327(e) counsel states, "[I]t is clearly in the best interest of the Debtor and the Debtors' estates for Mr. Stokes [Special Counsel] to continue representation of Debtors and affiliates in this matter.  Mr. Stokes is an expert in PACA."  (Bankr. Dkt. # 118 at 2.)  Delta Produce paid Special Counsel a retainer of $33,000 for his work as a § 327(e) counsel.  (Id. at 6.)

Nevertheless, regardless of whether Special Counsel was the trustee, functioned like a trustee, or was simply an independent, court-appointed special master, the logic of C.H. Robinson still holds true.  The Second Circuit's reasoning did not rely on Mandell's trustee-status.  Rather, the court looked to "the language of the [PACA] statute itself," noting:

> The trust provision of PACA requires a produce buyer to hold the produce and its proceeds and derivatives in trust for the benefit of the seller "until full payment of the sums owing in connection with such

---

[7] Section 327(e) provides for appointment of special counsel under certain criteria:

> The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such an attorney does not represent or hold any interest adverse to the debtor or to the debtor's estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

transactions has been received" by the unpaid seller.  7 U.S.C. § 499e(c)(2).  <u>It is clear from the language of PACA that beneficiaries are entitled to full payment of the contract price for the sale of produce</u>.  Unlike most common law trusts, a <u>PACA trust entitles the trust beneficiary to a sum certain</u>. The trust requirement is intended to supplement the seller's contract rights.

239 F.3d at 487 (emphases added).  Mandell's trustee-status was not dispositive. The court made clear that PACA intended the beneficiaries (or sellers) to <u>fully recover</u> before the debtor (buyer), as the PACA trustee, paid <u>any other creditors</u>. <u>See</u> <u>id.</u> at 488 ("Allowing a defunct PACA trustee to pay other creditors with PACA funds before the seller is paid in full would frustrate this purpose, and would be contrary to the language of PACA and its accompanying regulations. PACA trust beneficiaries are entitled to full payment before trustees may lawfully use trust funds to pay other creditors.").  In other words, the status of any other individual seeking PACA trust funds is irrelevant; PACA trust beneficiaries must be paid first before any other creditors can be paid.

      C.    <u>Policy Concerns with applying C.H. Robinson</u>

        In support of Special Counsel's Motion for Reconsideration, Amicus otherwise argues that this Court's previous order has "real and serious consequences for the administration of these cases resulting in losses for PACA trust creditors."  (Amicus Br. at 1.)  Essentially Amicus posits that because the Court prohibits trustees and/or special counsels from receiving any payment in

24

PACA cases and in most cases the PACA trust payables exceed the PACA trust

receivables, trustees and/or special counsels are left between "a rock and a hard

place": he or she can either "abandon the PACA trust assets, thereby leaving each

creditor to fend for itself and creating a multiplicity of litigation or attempt to

collect the PACA receivables with the attendant risk that the attorney's fees and

expenses expended may be unrecoverable."  (Id. at 3.)  Amicus then provides a

"parade of horribles" that will result if this Court does not vacate its earlier

opinion:

> Instead of protecting PACA trust creditors, the Order has resulted in a
> paralysis of the collection efforts in these bankruptcy proceedings to
> the detriment of both the PACA debtors and their PACA creditors.
> By making the PACA receivables of a Debtor uncollectable, it
> prevents the PACA creditors from realizing any value from the
> collection of their PACA trust receivables because even a court
> authorized collector acts at his financial peril.  This enables
> unscrupulous downstream parties to slow pay the PACA debtor,
> possibly even create or force the debtor into bankruptcy and reap a
> windfall because there is no ability of the debtor to collect its
> receivables.

(Id.)

Amicus and Special Counsel direct the Court's attention to several

cases wherein courts have relied on common-law trust principles to allow for the

payment of certain administrative expenses, such as attorneys' fees or fees for

services rendered in collecting receivables for the benefit of the PACA trust, to be

paid from the corpus of the PACA trust prior to its distribution to the statutory

25

beneficiaries.  See, e.g., In re Milton Poulos, Inc., 947 F.2d 1351, 1353 (9th Cir.

1991); In re Southland + Keystone, 132 B.R. 632, 643 (9th Cir. BAP 1991); In re

United Fruit & Produce Co., 119 B.R. 10, 13 (Bankr. D. Conn. 1990) ("[W]ell-

settled trust law furnishes the basis for compensating a trustee, unless [PACA]

otherwise provides.").  However, these cases are distinguishable as they generally

require the claimant to demonstrate that its efforts and resultant expenses were

"directly responsible for the availability of the funds from the [PACA] trust."  See,

e.g., Milton Poulos, 947 F.2d at 1353.

For example, in Milton Poulos the Court of Appeals for the Ninth

Circuit awarded attorneys' fees to the attorneys for a produce supplier because,

"[t]hrough their efforts, the bankruptcy court declared the trust valid and

enforceable, thereby permitting the funds to be [disbursed] among the trust

[beneficiaries.]"  Id. at 1353.  The court further explained that "the efforts of these

attorneys resulted in a common fund for the group."  Id.

Similarly, in United Fruit the bankruptcy court relied on common-law

trust principles as well as 11 U.S.C. § 506, in compensating a bankruptcy trustee

for its "necessary" services from the PACA trust funds prior to their distribution.

119 B.R. at 13 & n.5.  The court explained that "[t]he bankruptcy trustee of the

debtor's estate . . . rendered substantial services in collecting the PACA receivable

for the benefit of the PACA beneficiaries and in contesting [a seller's] claim that it

is entitled to a priority payment from [the PACA trust.]"  Id. at 13.  The court

further explained that "[t]he non-PACA creditors should not pay for these services

and the trustee should not be forced to donate them."  Id.

Finally, the court in Southland + Keystone, in harmony with the court

in United Fruit, similarly allowed the trustee "to offset [from PACA trust fund

monies] its collection costs."  132 B.R. at 643.  The court, however, limited the

amount of the offset "to the 'hard' costs of collection such as outside attorney's

fees and expenses that were necessary to the collection effort," and stated that costs

such as "overhead expenses are not recoverable."  Id.

The Fifth Circuit has not decided whether or not the common-law

trust principles would permit the recovery of attorney's fees as in the

aforementioned three cases.  For example, in Golman-Hayden Co., the court noted

that "[a] party may be entitled to attorney's fees from a common fund when acting

to either protect the trust from destruction or to restore it to its purpose."  217 F.3d

at 352–53.  However, because the litigation did not result in the establishment of a

common fund, the Fifth Circuit concluded that the district court erred in awarding

attorney's fees under the common fund exception.  The court "expressed no

opinion as to whether the common fund exception would permit the recovery of

attorney's fees under PACA if a common fund was established.  That decision

remains for another day."  Id. at 353.

27

But even in the absence of any Fifth Circuit explicit guidance, the aforementioned three cases permitting a special counsel's attorney's fees are easily distinguishable in light of the fact that PACA is a statutory trust, and as such, common law trust principles, like those relied upon in United Fruit, are not applicable if they conflict with the language of the statute.  C.H. Robinson, 239 F.3d at 487 ("[C]ommon law trust principles are not applicable if they conflict with the language of the statute, the clear intent of Congress in enacting the statute, or the accompanying regulations."); accord "R" Best Produce, Inc., 467 F.3d at 242; Pac. Intern. Mktg, Inc., 462 F.3d at 285; Boulder Fruit Exp. & Heger Organic Farm Sales v. Trans. Factoring, Inc., 251 F.3d 1268, 1271 (9th Cir. 2001).  Here, because PACA's § 499e(c)(2) unambiguously entitles PACA beneficiaries to full payment (i.e., a sum certain) before payment of any other creditor, United Fruit's reliance on common-law trust principles to pay the individual charged with administering the PACA trust funds ahead of the PACA beneficiaries is misplaced.  While it is understandable that "non-PACA creditors of the estate should not pay for [PACA administration] services" and individuals adjudicating such claims "should not be forced to donate them," United Fruit, 119 B.R. at 10, the language of PACA requires tendering "full payment" to PACA beneficiaries before paying any other creditor, even a creditor charged with administering the PACA trust like Special Counsel, see C.H. Robinson, 239 F.3d at 488 ("PACA trust beneficiaries are

28

entitled to full payment before trustees may lawfully use trust funds to pay other creditors.").

Moreover, while these cases' holdings are aimed at the equities that Amicus highlights, this Court finds that the aforementioned cases' holdings are inconsistent with the statutory text of PACA and that the text controls this Court's inquiry. Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000))). Title 7 U.S.C. § 499e(c)(2) unequivocally requires that suppliers must receive full payment:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2) (emphasis added). "It is clear from the language of PACA that beneficiaries are entitled to full payment of the contract price for the sale of produce. Unlike most common law trusts, a PACA trust entitles the trust beneficiary to a sum certain." C.H. Robinson, 239 F.3d at 487; see also Chiquita

Fresh N. Am., LLC v. Long Island Banana Corp., 14-CV-982 ADS AKT, 2014
WL 2854483, at *3 (E.D.N.Y. June 23, 2014) (holding that a PACA trust "is
continuous and exists from the moment produce is received until all suppliers are
paid in full" (emphasis added) (quoting Ger–Nis Int'l, LLC v. FJB, Inc., 07–cv–
898 (CM), 2008 WL 2600074, at *4 (S.D.N.Y. June 25, 2008))); J.A. Besteman
Co. v. Carter's, Inc., 439 F. Supp. 2d 774, 778 (W.D. Mich. 2006) ("[A] PACA
trust arises when the first PACA debt is incurred and continues thereafter until all
sellers are paid in full." (emphasis added)).

   While § 499e(c)(2)'s "full payment" requirement may seem
unforgiving as Amicus advances, it was purposeful.  In the early 1980s, Congress
recognized a more significant payment problem in the produce industry.  1984
U.S.C.C.A.N. at 406; see also Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 156
(11th Cir. 1990) ("In the early 1980s, Congress determined that the increase in
non-payment and delinquent payment by produce dealers threatened the financial
stability of produce growers.").  Congress recognized that "due to the need to sell
perishable commodities quickly, sellers of perishable commodities are often placed
in the position of being unsecured creditors of companies whose creditworthiness
the seller is unable to verify."  Endico Potatoes, 67 F.3d at 1067; see also Middle
Mountain Land and Produce Inc. v. Sound Commodities Inc., 307 F.3d 1220, 1223
(9th Cir. 2002) ("Unfortunately, PACA as originally drafted was unable to provide

complete protection to sellers. . . . If the buyer then declared bankruptcy, the seller would have 'no meaningful possibility' of receiving its contractual right to payment.").

To remedy this problem, in 1984, Congress amended PACA by creating a statutory trust "to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them."  1984 U.S.C.C.A.N. at 406.  The 1984 PACA Amendments further provided that the failure to maintain the PACA Trust and make full payment promptly to the trust beneficiary is unlawful, 7 U.S.C. § 499b(4), and PACA buyers were then "required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities," and any act or omission inconsistent with this responsibility, including dissipation of trust assets, is proscribed, 7 C.F.R. § 46.46(d)(1).  In short, PACA's statutory text unequivocally requires that PACA Trust assets must be used to pay the sellers of PACA goods ahead of all other creditors.

Furthermore, Amicus' equitable argument is not new.  In <u>In re Super Spud, Inc.</u>, 77 B.R. 930 (Bankr. M.D. Fla. 1987), the court considered a nearly identical contention:

Because the claims of PACA creditors far exceed the amount of assets

31

> in the estate, the trustee has argued that the position this court has taken is unfair in that it fails to compensate the trustee for his efforts in collecting the estate's assets.  This, he argues, obligates him to collect the estate's assets for the benefit of the PACA trust beneficiaries with no reimbursement for his own expenses.

Id. at 932.  In rejecting the trustee's argument, the court acknowledged the perceived "injustice," but reminded that it is bound by the law as written: "While this result is unfortunate, this court can find no support for the trustee's argument that the PACA claims be subordinated to that of the trustee.  Perhaps this is something Congress should address in the future."  Id.

The logical question that likely follows from Amicus's concern is: who should pay to adjudicate the PACA beneficiaries' claims?  Again, there admittedly is some logic in United Fruit's equitable holding that "[t]he non-PACA creditors of [the bankruptcy] estate should not pay for these services and the trustee should not be forced to donate them."  119 B.R. at 13.  At first blush, it does seem inequitable to make non-PACA creditors of the estate "pay" for legal services rendered in adjudicating PACA claims.  However, if the buyer were not in bankruptcy, the buyer would certainly use its own assets to pay for the services rendered in adjudicating PACA claims and tendering full payment to the sellers (PACA beneficiaries)—which if the buyer were in bankruptcy, those assets would be used to pay bankruptcy estate creditors.  Given that PACA is not a bankruptcy statute, and indeed functions as the controlling statute should there be a conflict

32

with the Bankruptcy Code, see In re Superior Tomato-Avocado, 481 B.R. 866, 872 (Bankr. W.D. Tex. 2012), it makes little sense to change how buyers pay for services rendered in paying out PACA claims simply because the buyer is in bankruptcy.

The Court also reminds that Special Counsel can be paid from the PACA trust res, but only after PACA trust beneficiaries receive full payment.  See C.H. Robinson, 239 F.3d at 488 ("PACA trust beneficiaries are entitled to full payment before trustees may lawfully use trust funds to pay other creditors."); see also id. ("A PACA trustee may use trust assets to pay ordinary business expenses as long as it does not do so at the expense of its PACA beneficiaries, or in any way impair the ability of the beneficiaries to collect money owed in connection with produce sales.").

Thus, Amicus' and Special Counsel's argument that this Court's holding would somehow sabotage the adjudication of PACA claims is not as compelling as they would have the Court believe.  PACA contemplates two options for Special Counsel to receive payment (or for a trustee to receive payment): (1) he can seek payment from the buyer/debtor, or (2) he can seek payment from the PACA trust, but only after all PACA beneficiaries have received full payment.

In this case, Special Counsel could seek his attorney's fees from Delta

33

Produce because it was Delta Produce's task, as the PACA trustee, to tender "full payment" to the PACA beneficiaries.  The fact that Special Counsel assumed Delta Produce's role and expended valuable time and resources to do so warrants Delta Produce paying for Special Counsel's services.  Alternatively, assuming there are additional funds in the PACA trust res, an unlikely, but not impossible scenario, Special Counsel could receive his payment from those excess funds.

## II.    Judicial Estoppel

Special Counsel also argues that the Court's judicial-estoppel analysis erred because Kingdom Fresh "expressly consented" to the bankruptcy court's order appointing Special Counsel and authorizing his fees.  (Mot. at 5–9.)  The Order found that the second-prong of a judicial estoppel inquiry—namely that the bankruptcy court must have accepted Kingdom Fresh's earlier position—was not present because "there [was] no evidence in the record that the bankruptcy court's January 25 Order permitting Special Counsel's fee to be paid out of the PACA trust 'accepted,' or relied on, Kingdom Fresh's earlier 'position.'"  (Order at 20.)  Special Counsel now argues that because Kingdom Fresh was "served with the motion to establish the PACA Order via ECF," "participated in the negotiations of the PACA Order," and "made an appearance at the hearing on the PACA Order," it expressly consented to the use of PACA trust funds to pay Special Counsel.  (Mot. at 5–6.)

Special Counsel's argument suffers from several flaws.  Express consent is "consent that is clearly and unmistakably stated."  Black's Law Dictionary (9th ed. 2009).  The three situations Special Counsel advances fall short of express consent.  First, being served with a motion plainly does not constitute express consent.  Second, although Special Counsel contends that Kingdom Fresh "participated in the negotiations of the PACA Order," this statement is an inaccurate reflection of the record.  Kingdom Fresh and the other PACA claimant Appellants were not parties to Delta Produce's Motion to Appoint Special Counsel and did not affirmatively state their consent to the PACA Order authorizing the payment of Special Counsel's fees from PACA trust funds.  Special Counsel likely acknowledges such as he cites the transcript of the September 21, 2012 hearing, which discussed Special Counsel's First Fee Application—not the underlying January 24, 2012 hearing on the PACA Order.  (Mot. at 5.)  Third, making an appearance at the hearing and failing to object does not equate to express consent.  Even the trial court in C.H. Robinson, which Special Counsel principally relies on, affirmed that "Robinson's counsel's silence did not amount to a promise to allow [debtor's counsel as trustee] to recover his fees from the PACA trust."  C.H. Robinson, 2000 WL 101238, at *6.

Special Counsel otherwise argues that Kingdom Fresh impliedly consented to paying his fees from PACA trust funds thereby satisfying the "court

acceptance" prong for judicial estoppel relief.  He relies on the bankruptcy court's
comments that it would have expected "vociferous objection" and "relief from this
appellate court" if Kingdom Fresh had opposed the PACA Order.  (Mot. at 6
(citing First Interim Fee Hr'g 40:17–19 (September 21, 2012 transcript)).)  He also
relies on the court stating, "[I]f there were aggr[eived] parties . . . it was incumbent
on those parties to speak up . . . ."  (Id. (citing First Interim Fee Hr'g 41:11–14))

        First, even when these comments were made at the September 21,
2012 hearing, they do not appear to be directed at whether Kingdom Fresh had
impliedly consented to Special Counsel's appointment or paying his fees from
PACA trust funds.  Rather, they reflect the bankruptcy court's concern regarding
whether Kingdom Fresh had impliedly consented to the bankruptcy court's
adjudicative authority.  The entire passage containing Special Counsel's cited
provisions reads:

> Similarly, this Court entered an order, pursuant to the district court's
> order of reference, believing itself duly entrusted with the necessary
> judicial power to do so by the district court's orders of reference.  And
> this Court, in reliance on those orders, said, well, then it's my job, and
> as I say, I don't have the authority to say no, so I'm going to do my
> job.  And once again, if there were aggrieved parties who believed
> that, in doing my job, I was doing something wrong, once again, I
> think it was incumbent on those parties to speak up and say so, lest we
> get down the road and find, after we'd done all that work and spent all
> that time and money, that we'd have to do it all over again, in another
> court.

(First Interim Fee Hr'g 41:4–18 (emphases added).)

                                         36

Second, Special Counsel deceptively characterizes these statements as having occurred "at the time of the [PACA] Order"—implying that the bankruptcy court made these caveats before Special Counsel's initial appointment and Kingdom Fresh must have impliedly consented by not objecting to paying Special Counsel's fees with PACA trust funds.  (Mot. at 7.)  However, the passages that Special Counsel cites are from the September 21, 2012 hearing on his First Interim Application for Fees—not the original January 24, 2012 hearing on the PACA Order authorizing his appointment and fee structure.  The transcript for the January 24, 2012 hearing does not contain any affirmative warning to Kingdom Fresh present in the courtroom at the January 24, 2012 hearing appointing Special Counsel and his fee structure.  Therefore, Special Counsel's arguments that Kingdom Fresh impliedly consented to paying his fees out of the PACA trust and that the bankruptcy court must have accepted such implied consent are unpersuasive, if not entirely misleading.

But even if the bankruptcy court had suggested that PACA claimants, such as Kingdom Fresh, should "speak up or forever hold their peace" before equitably estopping Kingdom Fresh from challenging Special Counsel's fees, that admonition is irrelevant in the context of PACA because Kingdom Fresh's attorneys could not have waived Kingdom Fresh's PACA "sum certain" trust rights without Kingdom Fresh's express written consent.  To illustrate, Congress enacted

PACA to "provide unpaid produce sellers with greater protection from the risk of default by buyers."  C.H. Robinson, 239 F.3d at 488.  PACA "was established by Congress to protect sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received."  In re Southland + Keystone, 132 B.R. at 639.  Because PACA claimants maintain a "superpriority" status, an agent for a PACA claimant cannot waive a PACA claimant's rights absent an express written waiver by the PACA claimant clearly showing the PACA claimant intended to waive its rights under the PACA.  See In re Cafeteria Operators, L.P., 299 B.R. 411, 419 (N.D. Tex. 2003) ("The regulations under PACA are clearly intended to prevent an agent from doing any act that would waive its principal's rights under PACA without an express written waiver by the principal clearly showing the principal's intent to waive its rights under PACA.").  As § 46.46(c)(2) makes clear,

> Persons acting as agents also have the responsibility to negotiate
> contracts which entitle their principals to the protection of the trust
> provisions: Provided, that a principal may elect to waive its right to
> trust protection.  To be effective, the waiver must be in writing and
> separate and distinct from any agency contract, must be signed by the
> principal prior to the time affected transactions occur, must clearly
> state the principal's intent to waive its right to become a trust
> beneficiary on a given transaction, or a series of transactions, and
> must include the date the agent's authority to act on the principal's
> behalf expires.

7 C.F.R. § 46.46(c)(2).  Further, under § 46.46(d)(2),

38

> Agents who sell perishable agricultural commodities on behalf of a principal are required to preserve the principal's rights as a trust beneficiary as set forth in § 46.2(z), (aa) and paragraphs (d), (f), and (g) of this section. Any act or omission which is inconsistent with this responsibility, including failure to give timely notice of intent to preserve trust benefits, is unlawful and in violation of Section 2 of the Act, (7 U.S.C. § 499b).

Id. § 46.46(d)(2).

Pursuant to these regulations, any "implied consent" that Kingdom Fresh's attorneys gave by failing to object to the bankruptcy court's order authorizing payment of Special Counsel's fees from PACA trust funds is irrelevant because the regulations clearly require PACA claimants to give express, written consent before abdicating PACA trust rights. In the absence of written consent from PACA claimants themselves, their agents and/or attorneys were unable to waive PACA claimants' "sum certain" trust rights by impliedly agreeing to pay Special Counsel's fees out of PACA trust funds.

## CONCLUSION

For the aforementioned reasons, the Court **DENIES** Special Counsel's Motion for Reconsideration (Dkt. # 24).

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, September 9, 2014.

_____
David Alan Ezra
Senior United States District Judge

39